1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOONG MYUNG CHO,

Plaintiff,

v.

CG INVITES CO., LTD., et al.,

Defendants.

Case No. 24-cv-07112-WHO

**ORDER ON MOTIONS TO DISMISS**

Re: Dkt. Nos. 50, 51

Plaintiff Joong Myung Cho ("Cho") brings thirteen (13) claims for relief arising from a fight for corporate ownership, some against the individual defendants Inchul Chung, Yong Kyu Shin, Soo Yeon Oh, and Randall Lee, all of whom are related to defendant CG Invites Co., Ltd. ("CG Invites"), others against corporate defendants CG Invites, Newlake Invites, and Newlake Alliance (all of these defendants collectively are the "CG Invites defendants") and Leo Kim. He asserts claims for tortious interference and aiding and abetting fraud against Kim alone. In short, Cho alleges that he entered into a series of agreements with CG Invites (referred to as the "Spinoff Agreements") through which the parties agreed that, in exchange for his resignation from the CG Invites' board of directors and a capital contribution of 6 billion KRW (approximately $4 million USD) into CG Pharmaceuticals, Inc. ("CGP"), a CG Invites subsidiary, Cho would become the 60% majority shareholder of CGP and assume control over the company's most valuable clinical trial. Cho claims that he fulfilled his obligations under the Spinoff Agreements but that the CG Invites defendants breached theirs and continue to breach by, among other things, failing to recognize Cho's majority shareholder status over CGP and otherwise interrupting what Cho says is his right to control CGP.

Cho's causes of action will be plausible against the CGI defendants if he alleges more

clearly how he has attained 60% majority shareholder status in CGP, a condition that undergirds the vast majority of his claims.  His claim for aiding and abetting fraud against Kim needs more specificity.  But the defendants' other arguments lack merit.  It appears that the CG Invites defendants are sufficiently connected to California to warrant the exercise of personal jurisdiction over them.  Cho's claim to majority shareholder status of CGP is plausible, at least for now, even though the company's Articles of Incorporation were never amended given the circumstances alleged.  It also appears that this court is an appropriate forum in which to litigate Cho's claims. That said, I doubt that it is in any party's best interest for litigation about the proper ownership structure of CGP to proceed in three different courts simultaneously; I encourage all counsel to consider what best serves their clients' interest and the interests of judicial economy with respect where this case is litigated.

**BACKGROUND**

### A.    Cho Starts CrystalGenomics (now CG Invites) and Subsidiary CGP

Cho is a Korean immigrant who has worked in the biopharmaceutical industry for over forty (40) years.  Second Amended Complaint ("SAC") [Dkt. No. 40] ¶ 40.  He immigrated to the United States in 1981 from Seoul, South Korea, and relocated to California in 1984, where he worked at LG Chemical, Ltd., a prominent South Korean pharmaceutical company.  *Id.* ¶ 41-42. In 2000, he left LG Chemical to start CrystalGenomics (now CG Invites), established to focus on "research and development of therapeutics for oncology, inflammation, and infectious diseases." *Id.* ¶ 43.  CG Invites became the first South Korean bioventure to go public and trade on KOSDAQ, South Korea's NASDAQ equivalent, in 2006.  *Id.* ¶ 44-45.  That year, Cho founded CG Pharmaceuticals, Inc., a California corporation and subsidiary to CrystalGenomics.  *Id.* ¶ 46. CGP was wholly owned by CrystalGenomics from its inception in 2006; until February 2024, no one contested that CGP was wholly owned by CrystalGenomics (or later CG Invites).  *Id.* ¶ 47.

### B.    Defendants Inchul Chung, Yong Kyu Shin, and Randall Lee Join CrystalGenomics

In 2016, Cho was introduced to Defendant Inchul Chung.  *Id.* ¶ 50.  Cho recruited Inchul Chung to be CrystalGenomics' CFO to continue expanding the company's global presence.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

Cho alleges that Inchul Chung quickly began spreading false rumors about Cho and his family in order to "turn the company's shareholders against [him]," "recruiting insiders to obstruct [Cho] from carrying on his duties as Chairman and CEO" and "soliciting outside investors to join his scheme to replace [Cho]." *Id.* ¶ 51.

Sometime in 2018, Inchul Chung became connected with Yong Kyu Shin and Randall Lee, founders of South Korean private equity firm Newlake Alliance. *Id.* ¶ 52. Newlake Alliance was presented to Cho as a strategic partner interested in pursuing a joint venture with CrystalGenomics. *Id.* ¶ 54. In 2020, Cho agreed to the proposed joint venture, which never came to fruition; Cho believes it was a ploy to oust him from his position as CEO. *Id.*

In March 2023, Yong Kyu Shin and Randall Lee created Newlake Invites, a shell fund entity[1] allegedly designed "to accelerate their acquisition of a controlling interest in CrystalGenomics." *Id.* ¶ 55. From May 2023 through 2023, Newlake Invites acquired a total of 22.02% of CrystalGenomics' stock. *Id.* CrystalGenomics was subsequently renamed CG Invites to reflect Newlake Invites' status as the company's largest shareholder. *Id.*

### C.    Soo Yeon Oh Becomes Involved in CG Invites

In 2020, Yong Kyu Shin and Randall Lee had become the largest shareholder of another bioscience company, BioCore, through another Newlake Alliance shell fund entity. *Id.* ¶ 59. Yong Kyu Shin became CEO of BioCore, which, similarly, was renamed Invites BioCore to reflect the update in ownership. *Id.* In 2023, shortly after Yong Kyu Shin and Randall Lee had become CG Invites' largest shareholder, Yong Kyu Shin stepped down as the CEO of Invites BioCore and appointed Soo Yeon Oh as his replacement. *Id.* ¶ 60-61. In her nominal role as CEO of Invites BioCore, Soo Yeon Oh carried out Yong Kyu Shin's directives. *Id.* ¶ 61. In March 2024, Yong Kyu Shin brought Soo Yeon Oh to CG Invites and again named her as a CEO of CG Invites. *Id.* ¶ 62. In addition to the new appointment as CEO of CG Invites, Soo Yeon Oh retained her position as CEO of Invites BioCore. *Id.* ¶ 63.

---

[1] A shell fund entity, commonly referred to as a shell corporation, is a company without active business operations or significant assets that exists for the purpose of holding funds and managing another entity's financial transactions.

**D.    The Ivaltinostat Trial**

One of the core objectives of CG Invites and CGP was to conduct clinical trials. *Id.* ¶ 65. Cho initiated and directed the research that resulted in the discovery of Ivaltinostat, a pancreatic cancer therapeutic that is currently in Phase II clinical trials. *Id.* ¶ 2. Cho and CGP's executive team designed the Ivaltinostat clinical trial. *Id.*

Beginning in November 2023, at Yong Kyu Shin's direction, Inchul Chung allegedly attempted to terminate CGP's Ivaltinostat clinical trial by instructing Syneos Health, LLC[2] ("Syneos") to stop the trial. *Id.* ¶ 66. Although Syneos informed Inchul Chung that the direction to halt the trial had to come from CGP in order to be effective, Inchul Chung threatened to terminate payments to Syneos if they failed to comply with his demands. *Id.* CGP declined Inchul Chung's termination request because the arbitrary pausing of the clinical trial could invalidate the entire trial. *Id.*

**E.    The CGP Spin-Off**

In December 2023, Cho approached Inchul Chung and Yong Kyu Shin with the idea to spin-off CGP into an independent company. *Id.* ¶ 68. Under the spin-off proposed by Cho, Cho would have majority control of CGP, and CGP would have the exclusive rights to develop, market, and distribute Ivaltinostat. *Id.* In exchange for obtaining majority control of CGP, Cho would agree "to surrender his control over CG Invites' board of directors, and to sell a substantial portion of his stake in CG Invites to Shin." *Id.* The CGP Spin-Off was memorialized in four agreements: the February 21, 2024 Subscription Agreement between CGP, Cho, and CGP Invites; the February 7, 2024 License Agreement between CGP and CG Invites; the February 7, 2024 Shareholder's Agreement between Cho and CG Invites; and the December 26, 2023 Shin Agreement (collectively, the "Spinoff Agreements" or the "Agreements"). *Id.* ¶ 69.

**1.    The Subscription Agreement and License Agreement**

Pursuant to the Subscription Agreement, the parties (Cho, CG Invites, and CGP) agreed to:

---

[2] Syneos Health, LCC ("Syneos") is the biopharmaceutical contract research organization hired by CGP to run the Ivaltinostat clinical trial.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(a) the in-licensing[3] of CG Invites' patents to Ivaltinostat to CGP; (b) Cho and CG Invites' agreement for Cho to contribute 6 billion KRW (approximately $4.6 million USD) and CG Invites to contribute 4 billion KRW (approximately $3 million USD) into CGP as consideration for the Agreement; (c) the establishment of a new equity structure whereby Cho "will own 60% of [CGP's] issued and outstanding voting Common Stock" as majority shareholder, and CG will remain as a minority shareholder with 40% of issued and outstanding Common Stock; and (d) an agreement to comply with CGP's document requests necessary to comply with any and all laws that CGP is subject to. *Id.* ¶ 70. According to Cho, CG Invites further agreed that Cho and CG Invites would be CGP's sole shareholders, where Cho had the authority to select two (2) of the three board members, and CG Invites would select the remaining member, giving Cho majority control over CGP. *Id.* ¶ 72. The Subscription Agreement was executed by all parties. *Id.*

Included in the Spinoff Agreements was the Ivaltinostat License Agreement (the "License Agreement"), the terms of which required CGP to pay CG Invites an upfront licensing fee of $80,000. *Id.* ¶ 108. Upon entering into the License Agreement, CGP advised CG Invites that "because CG Invites is a foreign offshore entity, [it] was required to submit certain tax forms before the upfront licensing fee could be issued." *Id.* ¶ 109. According to the complaint, CG Invites ignored and refused to comply with CGP's numerous requests for basic tax information. *Id.* ¶ 112. Still, Cho paid CGP's license fee to CG Invites for the License Agreement. *Id.* ¶ 114.

### 2.    The Shareholders' Agreement

Cho and CG Invites separately executed the Shareholders' Agreement to "'assure the continuity of the management and policies of [CGP]," and express the parties' "desire to enter into an agreement restricting the transferability of the Company's Securities . . . owned by them . . . and . . . setting forth agreements regarding the composition of the Company's Board.'" *Id.* ¶ 76. The Shareholders' Agreement echoed the Subscription Agreement in that it recognized Cho and CG Invites as sole shareholders of CGP, with a three-member board of directors comprised of two

---

[3] In-licensing refers to the process where a licensee acquires the rights to a product, technology, or intellectual property from the licensor. In the pharmaceutical industry, in-licensing often includes the rights to develop, manufacture, and market a given product.

(2) board members selected by Cho and one (1) member selected by CG Invites. *Id.* ¶ 75, 77. The Shareholders' Agreement also provided that CG Invites could not transfer any portion of its interest in CGP to a third party (or even a related party) without approval from the board. *Id.* ¶ 79. The complaint emphasizes Cho's belief that the information and restrictions outlined in the Shareholders' Agreement was intended to recognize Cho's majority control over CGP. *Id.* ¶ 80.

Together, the Spinoff Agreements memorialized an agreement where Cho would agree to "surrender his control over CG Invites' board of directors, and to sell a substantial portion of his stake in CG Invites to Shin" in exchange for 60% majority shareholder status in CGP and, consequently, control over the valuable Ivaltinostat trial. Cho alleges that he entered into the Spinoff Agreements with "the good faith belief that [he] and CG Invites could still run a successful joint venture to develop Ivaltinostat," but that Inchul Chung, Yong Kyu Shin, and Randall Lee "had no intention of allowing CG Invites to fulfill its contractual obligations" and that the Spinoff Agreements were yet another tool to "induce Cho to step down as Chairman of CG Invites." *Id.* ¶ 81, 82.

The Shareholders Agreement contains a "Cross-Contingency" provision, which provides that "notwithstanding anything to the contrary, the closing of this Agreement and the effectiveness thereof shall be contingent upon execution and effectiveness of each of the Transaction Documents and closing of the Subscription Agreement." Pursuant to the Subscription Agreement, Cho and CG Invites agreed for Cho to contribute 6 billion KRW (approximately $4.6 million USD) and CG Invites to contribute 4 billion KRW (approximately $3 million USD) into CGP as consideration for the Agreement. SAC ¶ 70.

In the SAC, Cho states that he "ha[s] fulfilled [his] obligations under the Spinoff Agreements." SAC ¶ 10. He says he resigned from CG Invites' board of directors and sold a controlling stake in the company to Shin. *Id.* Then he says that "to date, [he] has invested more than 6 billion KRW in new funds into CGP pursuant to the Subscription Agreement." *Id.* He specifies that wire transfer records and bank statements he provided to CG Invites show that he has invested "more than $4.3 million into CGP since February 2024, which is well in excess of the 6 billion KRW (approximately $4 million) [he] committed to pay for his 60% majority interest in

CGP." *Id.* ¶ 12.

**F.    Purported Breach of the Spinoff Agreements**

In the months following the execution of the Spinoff Agreements, Inchul Chung and Soo Yeon Oh allegedly disregarded Cho's rights and failed to perform their obligations under the Agreements.  *Id.* ¶ 84.  In a letter dated July 18, 2024, in response to CGP's request for CG Invites to make its initial 4 billion KRW (approximately $3 million USD) contribution as consideration under the Subscription Agreement, Inchul Chung and Soo Yeon Oh retorted that the contribution amount was "arbitrarily set" and that performance under the Agreements is "seriously misunderstood by both parties." *Id.* ¶ 85.  In that same letter, CG Invites demanded Cho's resignation from CGP's board and that CG Invites be given full operational control over Ivaltinostat.  *Id.* ¶ 86.  Cho alleges that upon information and belief, Cho and Soo Yeon Oh (through their authority under CG Invites) demanded total control over Ivaltinostat to, in part, "'shut down . . . [CGP] and transfer all of the IP and study logistics [for Ivaltinostat] to [a] new entity' outside of Cho's control.  *Id.* ¶ 87.  A few months later, CG Invites publicly stated to shareholders that CGP is still 100% owned by CG Invites and that CG Invites was actively seeking opportunities to sell Ivaltinostat to or partner with third parties, despite Cho's alleged contribution under the Shareholder Agreement and CG Invites' alleged failure to make its return contribution.  *Id.* ¶ 88.

**G.    Leo Kim Becomes Involved with CGP**

In August 2023, before the Spinoff Agreements were drafted, CGP hired Leo Kim ("Kim") to be CGP's Vice President of Business Operations.  *Id.* ¶ 90.  Kim was fired in June 2024, less than a year later, for "poor work performance" and because Cho suspected that Kim was acting under Inchul Chung's direction to interfere with Cho and CGP's operations.  *Id.*  In one instance, on June 29, 2024, after the Subscription Agreements were signed, Kim sent Inchul Chung an email (translated from Korean to English) with the subject line "Leo Kim resume and another business plan as a show of competence," that included his resume and promoted his experience and valuable connections.  *Id.* ¶ 91.  The email contained two disparaging remarks about Cho, one of which stating that "***Even if the Cho family wakes up from the dead***, they will not be able to

7

1    build a biotech company of this level or attract this world-class Big Pharma talent you see in the

2    data." *Id.* ¶ 91 (emphasis in original).

3        On June 30, 2024, the day after Kim's email to Inchul Chung, Kim sent an email from his

4    CGP email address to Sale Kwon, a partner at Cooley LLP, with the subject line "URGENT – Can

5    you help with CG Pharma re-formation?" *Id.* ¶ 94.  The email read:

> Hi Sale – Happy Sunday, and apologies for the weekend email. This is my day job email
> account. I am in a talk with the mothership in Korea (CG Invites, no longer under the Cho
> family control) and their PE investor [Newlake Alliance Management] to take over the
> wholly-owned US subsidiary CG Pharma that is in charge of the ongoing ivaltinostat Phase
> II clinical trial in pancreatic cancer. It will most likely be done by dissolving the current
> entity, setting up a new company similar to Higher Medicine[4], and transferring all the IP
> and ongoing CRO relationships (Syneos is the main partner among a bevy of external
> partners. Internal staff is only 2, excluding the Cho family)….The mothership is ready to
> inject $5M immediately, so this will be a non-deferred, billable service.

10   *Id.* ¶ 95.

11       According to the SAC, at the time that Kim was writing these emails, he was aware of

12   Cho's majority ownership of CGP.  *Id.* ¶ 97.  On July 18, 2024, two weeks after these emails were

13   sent, Inchul Chung and Soo Yeon Oh sent a letter to Cho demanding his "immediate resignation"

14   from CGP's board.  *Id.* ¶ 100.

15       When CGP fired Kim in June 2024, it demanded his immediate return of all company

16   property, including CGP-issued electronic devices.  *Id.* ¶ 101.  Kim refused to fulfill this request

17   for months.  *Id.*  In November 2024, four months after his termination, Kim returned (1) one

18   Lenovo laptop; and (2) one iPhone 14 Pro and accessories that CGP issued to Leo Kim (together

19   the "CGP Electronic Devices").  *Id.* ¶ 102.  Although Kim was allegedly aware of his preservation

20   obligations as a named party in two lawsuits involving CGP, Kim had deleted all data and

21   evidence from the CGP Electronic Devices.  *Id.* ¶ 103.  Cho alleges that Kim intentionally

22   destroyed this evidence in coordination with Inchul Chung and in furtherance of the defendant's

23   "fraudulent scheme." *Id.* ¶104.

24       **H.      CG Invites Terminates License Agreement**

25       In August 2024, instead of cooperating under the terms of the License Agreement, CG

---

[4] Higher Medicine, Inc. ("Higher Medicine") is a biotechnology research entity incorporated in
Delaware by Kim on May 7, 2024.

United States District Court
Northern District of California

Invites purported to terminate the License Agreement, and in turn, sought to impede CGP's ability to continue the Ivaltinostat clinical trial. *Id.* ¶ 112. Cho asserts that the "purported license termination letter" was invalid for violation of the License Agreement's notice provision that required CG Invites to provide both written notice of alleged breach and the required time period to cure or address any alleged breach. *Id.* ¶ 113. As of the May 6, 2025, the date of filing of the SAC, CG Invites still had not provided Cho or CGP with notice of the alleged breach. *Id.* ¶ 113.

### I.     Soo Yeon Oh files Statements of Information with the California Secretary of State

On August 12, 2024, CG Invites allegedly purported to issue a "Unanimous Written Consent of Shareholders of CG Pharmaceuticals, Inc." where CG Invites claimed to have a unanimous vote to remove CGP's board and appoint Soo Yeon Oh and Hong Kyu Yang as board members. *Id.* ¶ 117. Cho was not given notice of this restructuring. *Id.* ¶ 119.

On September 9. 2024, CG Invites issued a "demand letter" to CGP, addressed to Cho, with the subject line "Request for Cessation of Illegal Activities by Dismissed Directors and Officers and Fulfillment of Handover Obligations." *Id.* ¶ 121. In the letter, CG Invites asserted that it was the 100% shareholder of CGP. *Id.* ¶ 123.

On September 26, 2024, CGP's executive officers met with Inchul Chung and Soo Yeon Oh at CG Invites' headquarters in Seoul, South Korea to discuss CG Invites' breach of the Spinoff Agreements. *Id.* ¶ 132. The meeting concluded with CG Invites' refusal to carry out its contractual obligations under the Spinoff Agreements. *Id.*

On September 4, 2024, Soo Yeon Oh filed a Statement of Information with the California Secretary of State identifying herself as CGP's duly authorized CEO. *Id.* ¶ 15, 132, 206. On October 2, 2024, CGP wrote to Soo Yeon Oh, Inchul Chung, and Yong Kyu Shin, to discuss the status of CGP and Soo Yeon Oh's attempt to name herself as CGP's CEO; Soo Yeon Oh, Inchul Chung, and Yong Kyu Shin never responded. *Id.* ¶ 136.

### J.     Other Pending Actions

There are two other pending actions concerning similar parties and issues as the present case. These actions are relevant to the discussion over forum selection.

### 1.    The Contra Costa County Action

Defendants CG Invites, Inchul Chung, Soo Yeon Oh, Newlake Invites Investment, Ltd., Newlake Alliance Management, Ltd., Seung Hee Lee, and Yong Kyu Shin (all of the defendants in the present case except Leo Kim) filed an action against Cho's son and wife in the Superior Court of Contra Costa County, concerning Cho's ownership rights over CGP. *See* Dkt. No. 26 Ex. A (Contra Costa Complaint).  That action seeks a judicial determination related to CGP's ownership. *Id.*  Cho is not a party to the Contra Costa action. *See* Dkt. No. 26 Ex. A (Contra Costa Complaint).

### 2.  The Seoul Central District Court Action

There is also pending litigation in Seoul Central District Court in Korea, 2025*gahap*10088, between Cho and Yong Kyu Shin. CGI Motion at 16 (citing Declaration of Yong Kyu Shin ("Y. Shin Decl.") [Dkt. 44] ¶¶ 14, 15).  The CG Invites defendants assert that the Korean Action concerns the same issues as here.  *Id.*

## DISCUSSION

## I.    CHO'S PERFORMANCE UNDER THE SPINOFF AGREEMENTS

The CG Invites defendants argue that Cho has failed to allege "whether or not the Subscription Agreement was *ever closed* (1) to cause the alleged change in the shareholder structure within CGP under the Subscription Agreement Section 6(e)(iv), or (2) to enable [Cho] to appoint two board members of CGP pursuant to the Subscription Agreement's preamble or the Shareholders Agreement's Section 6." CGI Motion to Dismiss ("CGI Mot.") [Dkt. No. 51] 9. Defendants take the position that the Subscription Agreement never closed, meaning that the Shareholders Agreement never took effect and Cho cannot allege that they breached either.

Under California law, one cannot become a shareholder without paying for the shares to be issued. Cal. Corp. Code § 409.  Defendants contend that what Cho refers to as his investment in CGP "to date" "in excess of $4.3 million" was finished well *after* Cho initiated this action.  CGI Mot. 9 (referencing SAC ¶¶ 10, 11).  Accordingly, the CG Invites defendants argue, Cho did not have 60% ownership in CGP at the time of filing, nor did he lay any legal basis for how he could possibly become the 60% shareholder of CGP in February 2024, the moment he entered into the

1    Spinoff Agreements. *Id.* at 10. Cho argues that he gained 60% ownership in CGP upon his capital

2    contribution, which he says has occurred. Oppo. to CGI Mot. 11; SAC ¶¶ 10, 12.

3         Documents submitted by the defendants, the veracity of which was confirmed by counsel

4    for Cho at the hearing on this matter, suggest that Cho did not invest the requisite $4 million USD

5    in CGP prior to filing this lawsuit. This is not inconsistent with representations in the SAC, where

6    Cho states that he "ha[s] fulfilled [his] obligations under the Spinoff Agreements" in that "to date,

7    [he] has invested more than 6 billion KRW in new funds into CGP pursuant to the Subscription

8    Agreement." SAC ¶ 10. He specifies that wire transfer records and bank statements he provided

9    to CG Invites show that he has invested "more than $4.3 million into CGP since February 2024,

10   which is well in excess of the 6 billion KRW (approximately $4 million) [he] committed to pay for

11   his 60% majority interest in CGP." *Id.* ¶ 12.

12        The CG Invites defendants provided the wire transfer records and bank statements that Cho

13   references in the SAC. *See* Declaration of Soo Yeon Oh ISO Motion [Dkt. No. 54] Exs. B, E. At

14   the hearing, I asked Cho whether he disputes that these wire transfer records are an accurate

15   representation of the capital investment he made in CGP before filing this lawsuit: Counsel for

16   Cho confirmed that the wire transfer records attached to the CG Invites defendants' motion are an

17   accurate representation of Cho's capital contribution to CGP in the time between executing the

18   Spinoff Agreements and filing this lawsuit. Those records show that the only two investments in

19   CGP that Cho made *prior* to filing this lawsuit on October 10, 2024, were a $600,000.00 USD

20   investment made on July 15, 2024, *see id.* Ex. E, and a $650,000.00 USD investment made six

21   days before filing this lawsuit, on October 4, 2024, *see id.*[5] These numbers are, of course, well

22   under the $4 million the investment of which would have closed the Subscription Agreement and

23   transferred majority ownership in CGP to Cho.

24        The parties appear to agree that Cho has made other significant capital contributions since

25   filing this lawsuit, which add up to over $4 million USD. SAC ¶ 12; Oh Decl. Exs. B, E. It is not

26   clear from the SAC whether these contributions were made pursuant to the Subscription

27

28   _____

[5] At oral argument, counsel for Cho conceded that the allegations regarding Cho's performance
warrant greater specificity and expressed willingness to amend the complaint accordingly.

United States District Court
Northern District of California

Agreement or in some other capacity, or whether such a distinction would matter for the purposes of satisfying Cho's obligations under the Subscription Agreement. Given that this litigation turns on the question of who rightfully owns and controls CGP, Cho shall amend his complaint to plead facts showing that he has satisfied his performance obligations under the Spinoff Agreements. Without that clarity, the entire lawsuit is on unstable ground. The CG Invites defendants' motion to dismiss Cho's claims is GRANTED with leave to amend.

## II.    PLAUSIBILITY OF PLAINTIFF'S CLAIMS AGAINST CG INVITES DEFENDANTS

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

While I am granting the CG Invites defendants' motion to dismiss on the issue of performance, it does appear that if Cho can cure that defect, the remainder of his claims are plausible. I provide this analysis in the hopes of avoiding future motions to dismiss and encouraging the parties to get to the merits of these issues.

### A.    Individual Claims Against the CG Invites Defendants

Cho asserts five claims individually against the CG Invites defendants: Breach of Shareholders' Agreement, Breach of Subscription Agreement, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, and Civil Conspiracy. SAC at pp. 26, 28, 32, 35, 46. Cho asserts a civil conspiracy claim against all defendants both individually and derivatively on behalf of CGP. *Id.* at pp. 46, 29.

12

United States District Court
Northern District of California

1    **1.      Breach of the Spinoff Agreements Against CG Invites (Claims One and Two)**

2        To plausibly allege breach of contract, plaintiff must plead facts showing "'(1) the

3    contract, (2) plaintiff[s]' performance or excuse for nonperformance, (3) defendant[s]' breach, and

4    (4) damage to plaintiff[s] therefrom.'" *Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal.

5    App. 4th 1171, 1178 (2008). Aside from performance, these claims are plausible. Cho alleges

6    that CG Invites breached the Shareholders' Agreement by refusing to recognize Cho's majority

7    control over CGP and unreasonably withholding consent to allow Cho to properly manage CGP's

8    operations. *See* SAC ¶ 151. He claims that CG Invites breached its obligations when it attempted

9    "to unilaterally terminate CGP's two board members appointed by [Cho], and replace them with

10   CG Invites' insiders" and when it "refused to recognize [Cho's] rights to appoint two of CGP's

11   three-member board." *Id.* ¶ 148. He further argues that for its own personal benefit, CG Invites

12   subverted Cho's right to control operations and manage the clinical trial of CGP's most valuable

13   asset, Ivaltinostat. *Id.* ¶ 150. If true, these facts could plausibly establish CG Invites' breach. *See*

14   *Wall St.*, 164 Cal. App. 4th at 1178.

15       As for damages, Cho alleges that they include, but are not limited to, "[Cho's] capital

16   investments into CGP, the current and future value of [Cho's] 60% interest in CGP, the enterprise

17   value of the Ivaltinostat drug, and the value of [Cho's] rights to control and operate CGP." SAC ¶

18   152. He also notes that, as provided in Section 10 of the Shareholders' Agreement, the parties

19   agreed that "a breach by any Shareholder or the Company of any covenant or provision in this

20   Agreement will cause damages for which there will not be an adequate remedy at law" and,

21   therefore, in such an instance, the aggrieved party shall be entitled to specific performance and

22   injunctive relief. *Id.* ¶ 153. Apart from deficiencies within allegations of his own performance,

23   Cho's claim for breach of Shareholders' Agreement appears to be plausibly alleged.

24       As for the breach of contract claim with respect to the Subscription Agreement, Cho

25   alleges that CG Invites breached its obligations under the Subscription Agreement "when it failed

26   to make the CG Invites Initial Contribution in accordance with Sections 1 and 4 of the

27   Subscription Agreement," and when it "refus[ed]" to "comply with its contractual obligations" of

28   providing Cho "with 'documents or instruments . . . necessary in the discretion of the Company

13

for the Company to comply with any and all laws, rules and regulations to which the Company is subject.'" SAC ¶¶ 157, 158.  He also cites CG Invites' decision to "unilaterally terminate and replace CGP's two board members," and its subversion of Cho's right "to control CGP's operations and manage CGP's Ivaltinostat clinical trial," as further evidence of breach.  *Id.* ¶¶ 159-60.  Taking these allegations to be true, they plausibly illustrate breach by CG Invites of the Subscription Agreement.  Damages mirror those Cho identified for the purported breach of the Shareholders Agreement: "his capital investments into CGP, the current and future value of [Cho's] 60% interest in CGP, the enterprise value of the Ivaltinostat drug, the value of [Cho's] rights to control and operate CGP, and the monetary damages caused to CGP resulting from CG Invites' [alleged] breach and interference with [Cho's] rights." SAC ¶ 161.

Assuming that Cho is able to amend his complaint once more to clarify that he performed under the Spinoff Agreements despite not making his required investment in CGP until after filing this action, his breach of contract claims against the CG Invites defendants appear to be plausible.

### 2.    Breach of the Implied Covenant of Good Faith and Fair Dealing Against CG Invites (Fifth Claim)

"[T]o state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify the specific contractual provision that was frustrated." *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 955 (N.D. Cal. 2012) (citing *Lingad v. Indymac Fed. Bank*, 682 F. Supp. 2d 1142, 1154 (E.D. Cal. 2010)).  Cho alleges that CG Invites breached the implied covenant owed to Cho by, inter alia, "refusing to recognize [Cho's] 60% majority ownership of CGP"; conspiring to "misappropriate CGP's assets"; attempting to replace Cho's appointed board members with Oh and CG Invites' CFO; "threaten[ing Cho] with criminal action if [Cho] . . . maintain[ed] his position as the 60% majority shareholder of CGP; "fail[ing] to cooperate with CGP's request for tax-related documentation"; and when Oh "filed multiple fraudulent statements of Information with the California Secretary of State naming herself as CGP's CEO, and Hong Kyu Yang as CGP's CFO and Secretary; and named herself as Agent for Service of Process for CGP." SAC ¶ 184.  Cho generally submits that this conduct is at odds with both the representations made by Shin in the Shin Agreement and with "CG Invites' renewed

confirmation to [Cho] in July 2024 that he was the 60% majority owner of CGP with the right to appoint two members to CGP's three-member board of directors." *Id.* ¶ 185.

This claim contains a slew of allegations that challenge conduct by individual CG Invites defendants, presumably taken on behalf of the company. *See* SAC ¶ 184(a)-(g). Cho claims asserts that these actions were inconsistent with "representations Yong Kyu Shin made in the Shin Agreement, and CG Invites' renewed confirmation to Plaintiff in July 2024 that he was the 60% majority owner of CGP[.]" *Id.* ¶ 185. When he amends his pleadings, Cho should take care to specify what specific "representations . . . made in the Shin Agreement" the CG Invites' defendants' actions frustrated. *See McNeary-Calloway*, 863 F. Supp. 2d at 955. But it appears that he will be able to state this claim.

### 3. Fraud Claims Against the CG Invites Defendants (Claims Six and Seven)

The elements of common law fraud are: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damages." *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1261 (N.D. Cal. 2022). Under California law, liability for aiding and abetting fraud requires that the abettor "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Bard v. GSV Asset Mgmt., LLC*, No. 23-CV-00488-WHO, 2023 WL 6429747, at *2 (N.D. Cal. Oct. 2, 2023) (quoting *Marcelos v. Dominguez*, 2008 WL 2788173, at *8 (N.D. Cal. July 18, 2008)).

Cho alleges that "[t]o induce [his] performance on his portion of the deal, i.e. [Cho's] separation from CG Invites, and [Cho's] sale of the majority of his CG Invites' shares to Yong Kyu Shin," Shin entered into the contract known as the "Shin Agreement" with Cho on December 26, 2023. "Through the Shin Agreement, Yong Kyu Shin represented that CG Invites 'shall invest KRW 4 billion for the acquisition of new stocks' in CGP, that CG Invites would 'enter into an agreement to establish an exclusive license of Ivaltinostat…to CGP,' and that CGP would be

governed by a three-member board of directors under Dr. Cho's control." SAC ¶ 197.   Cho alleges that Inchul Chung was a part of this negotiation; Inchul Chung also "negotiated and drafted the Subscription Agreement and Shareholders' Agreements and signed those agreements on behalf of CG Invites." *Id.* ¶ 198.   Cho claims that "CG Invites, Inchul Chung, and Yong Kyu Shin knew their representations were false when made, including that they had no intention of performing under the Spinoff Agreements and that they intended to deprive Dr. Cho of the bargain he struck with them." *Id.* ¶ 199.   Moreover, he alleges that "[a]t the time CG Invites entered into the Spinoff Agreements, it had exclusive knowledge of material facts not known to Plaintiff. Specifically, that after inducing Plaintiff's agreement to surrender control of CG Invites to Inchul Chung and Yong Kyu Shin, that these defendants' intentions were to 'shut down' CGP and transfer CGP's assets to a newly formed entity thereby leaving CGP as an empty shell and leaving Plaintiff the majority owner of a shell entity with no assets. CG Invites concealed this information from Plaintiff to induce Plaintiff's performance under the Shin Agreement, including surrendering control over CG Invites' board of directors to Yong Kyu Shin." *Id.* ¶ 200; *see also id.* ¶¶ 202-206 (laying out more allegations pertaining to the CG Invites defendants' alleged fraud).

The CG Invites defendants do not challenge the sufficiency of Cho's fraud allegations on the elements; instead, they say that CGP's articles of incorporation were not amended to permit the issuance of additional shares, meaning Cho could have never received the shares to which he says he was entitled.  CGI Mot. 17-18.  The CG Invites defendants also argue that Cho cannot pursue his fraud claims against Shin, Chung, and Oh in California because of a forum selection clause requiring that the claims be litigated in Korea.  As I discuss later, I do not credit either argument, at least not at this early stage in the case.  Cho's fraud claims, both for the direct tort and for aiding and abetting liability, are seemingly plausible.

### 4.    Conspiracy Claims Against All Defendants (Claims Eleven and Twelve)

To plead civil conspiracy a plaintiff must allege "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy and (3) damages arising from the wrongful conduct." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016) (affirming adequacy of civil conspiracy allegations).  Cho says that "[d]ocumentary evidence

1    uncovered through Plaintiff's preliminary investigations confirm that Defendants entered into a

2    common plan or scheme for Defendants to 'take over the wholly-owned US subsidiary CG

3    Pharma that is in charge of the ongoing ivaltinostat Phase II clinical trial in pancreatic cancer,' and

4    that the scheme 'will most likely be done by dissolving the current entity,' and 'setting up a new

5    company.'" SAC ¶ 256.  Cho believes that "[t]he goal of Defendants' scheme was the 'transfer[]

6    [of] all the IP and ongoing CRO relationships' of CGP to a 'new entity' that would be funded with

7    $5 million from CG Invites and Newlake." *Id.* ¶ 257.

8         Cho's conspiracy claim, like his other claims against the CG Invites defendants, proceeds

9    partly under the assumption that CG Invites would be wrong to "take over" CGP and its clinical

10   trials.  If CG Invites remained the rightful sole owner of CGP even after the execution of the

11   Spinoff Agreements because Cho did not invest the required funds in CGP such that the

12   Shareholders Agreement could close, this is a moot claim.  But if he can plausibly amend, the

13   allegations set forth in the SAC at ¶¶ 256-266 set forth sufficient facts from which all the

14   defendants can ascertain what it is they are alleged to have conspired about such that they may

15   raise a defense.  Cho alleges that CG Invites created the conspiracy, funded the defendants'

16   "fraudulent scheme with $5 million," and sponsored "the duplicative State Court Action to

17   prohibit Dr. Cho from laying claim to CGP." Oppo. to CGI Mot. 15; SAC ¶¶ 16-17; 134; 255-266;

18   267-277.  Cho cites emails between Chung and Kim, and between Kim and a California lawyer

19   that he says indicate Chung "recruited Kim to join Defendants' conspiracy, disclosed the precise

20   details of CG Invites' scheme to remove Dr. Cho as 'the head of ivaltinostat development,' and

21   confirmed that along with Yong Kyu Shin and Newlake Alliance, the goal was to 'take over' CGP

22   and its 'ongoing ivaltinostat Phase II clinical trial in pancreatic cancer.'" SAC ¶¶ 91-97.

23        **B.    Derivative Claims Against CG Invites**

24              **1.    Preliminary Issues**

25        As a preliminary matter, Defendants argue that Cho's derivative claims against CG Invites

26   fail because Cho lacks standing to bring a shareholder derivative suit and because the SAC failed

27   to meet the pleading requirements for a derivative action.  CGI Mot. 15.  The resolution of these

28   arguments depends upon whether Cho is able to plausibly allege that he performed under the

United States District Court
Northern District of California

Subscription Agreement. *See* discussion *supra*, Section I.

Under Federal Rule of Civil Procedure 23.1, only "shareholders or members of a corporation or an unincorporated association" can bring a derivative action on behalf of a company. Fed. R. Civ. P. 23.1. CGP was wholly owned by CrystalGenomics from its inception in 2006, and only since the proposed Spinoff has its ownership been disputed. SAC ¶ 47. Defendants argue that because the Subscription Agreement is unclosed and the Shareholders' Agreement never took effect, Cho never became a shareholder of CGP, so he is not authorized to bring a derivative action on behalf of it. CGI Mot. 12. The closing of the Subscription Agreement is a threshold issue contingent upon Cho's improved repleading of performance. That issue should be fixed on amendment.

Defendants argue that even if Cho were assumed to be a shareholder of CGP, he has not alleged with particularity facts regarding Federal Rule of Civil Procedure 23.1(b)(3)(A) and (B), and therefore fails to meet the pleading requirements. CGI Mot. at 14. Under Federal Rule of Civil Procedure 23.1(b), a derivative action's complaint "must be verified and must:

> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
> (3) state with particularity:
>> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>> (B) the reasons for not obtaining the action or not making the effort."

Fed. R. Civ. P. 23.1(b).

Cho responds that "by resolution dated October 26, 2024, CGP's board of directors . . . resolved to authorize Dr. Cho to prosecute claims on CGP's behalf and to take any actions necessary to prosecute claims against Defendants on CGP's behalf." SAC ¶¶ 34, 38, 39. If Cho amends his complaint as discussed, I would assume that he could bring derivative claims on behalf of CGP, understanding that discovery could reveal a different state of things.

### 2. Derivative Claim for Breach of a Fiduciary Duty Against CG Invites (Seventh Claim)

"'The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the

breach.'" *Prostar Wireless Group, LCC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d. 994, 1008 (N.D. Cal. 2018) (citing *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995)).  Cho alleges that CG Invites, "as 40% minority shareholder . . . is vested with material rights to direct and influence CGP's operations." SAC ¶ 222.  He claims that CG Invites breached its fiduciary duty to CGP in "numerous respects," outlined at SAC ¶ 223, including, inter alia, by concealing its scheme to shut down CGP, oust Cho from CG Invites, obstruct CGP's ability to conduct business operations, transfer Ivaltinostat away from CGP, and to enrich CG Invites at CGP's expense.

Defendants' response is to argue that fiduciary duties typically arise for majority shareholders due to their ability to exert influence over the company, *see* CGI Mot. 15 (citing *Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 108, 460 P.2d 464, 471 (1969)), and to assert, without support, that under California law, "minority shareholders generally do not owe fiduciary duties to the corporation solely based on their status as minority shareholders." CGI Mot. 15.  This is a surprising argument coming from the CG Invites defendants, whose entire motion rests on the argument that CG Invites never gave up majority shareholder status over CGP.

With respect to damages, Cho alleges that CG Invites' breach "has forced CGP to expend significant resources to compel CG Invites' performance of the Spinoff Agreements, to investigate CG Invites' fraudulent scheme against the company and Dr. Cho, and to search for alternate means of funding due to CG Invites' refusal to perform any portion of its financial obligations to CGP." SAC ¶225.  This is sufficient, for now.  Assuming Cho amends the SAC as to performance as discussed throughout this Order, and assuming that he can bring a derivative suit on behalf of CGP, his breach of fiduciary duty claim would be plausible as alleged.[6]

---

[6] Cho also asserts derivative claims on behalf of CGP for breach of the Spinoff Agreements against the CG Invites defendants (Claims Three and Four) and for civil conspiracy against all defendants (Claim Twelve).  As I have already addressed the sufficiency of those claims brought by Cho individually, and the claims proceed based upon the same factual allegations, I do not revisit their factual underpinnings in the derivative context.  I will reiterate that at this point it is still unclear whether (1) Cho performed under the Spinoff Agreements and, relatedly, whether (2) Cho can bring a derivative suit on CGP's behalf.  I will rule definitively on the plausibility of these claims (and Cho's other claims against the CG Invites defendants) after Cho amends his complaint as directed.

United States District Court
Northern District of California

### III.    PLAUSIBILITY OF CHO'S CLAIMS AGAINST KIM

#### A.    Tortious Interference with Contract Against Kim (Claim Eight)

Under California law, a tortious interference with contractual relations claim has five elements: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts to induce breach or disruption of the contractual relationship; (4) actual breach; and (5) resulting damage." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022). Cho identifies two emails as the factual basis for his tortious interference claim: Kim's June 29, 2024 email to Inchul Chung entitled "Leo Kim resume and another business plan as a show of competence," that included his resume and promoted his experience and valuable connections, and Kim's June 30, 2024 email to attorney friend Sale Kwon entitled "URGENT – Can you help with CG Pharma re-formation?" SAC ¶ 91, 94.

The plausibility of Cho's tortious interference with contract claim turns on whether the third element is met. Defendant Kim asserts that the claim fails because the SAC fails to allege any facts to suggest Kim took actions to induce a breach of contract, therefore failing the third element. Kim Motion to Dismiss ("Kim Mot.") [Dkt. No. 50] 4. Kim argues that the June 30th email to Sale Kwon did not reveal any concrete action or influence by Kim, but rather, revealed only discussions of potential future actions. *Id.* at 5. Kim provides that while Cho alleges a connection between Kim's emails and the actions taken by other Defendants, Cho fails to provide facts to support that allegation. *Id.* at 6.

Kim misstates the legal standard governing such claims. Alleged actions intended to "disrupt[] a contractual relationship" are sufficient for the pleading stage. *hiQ Labs, Inc.*, 31 F.4th at 1191.[7] The emails show "disruption of the contractual relationship" sufficient to support Cho's tortious interference claim. The June 29, 2024 email (which allegedly stated that "[e]ven if the Cho family wakes up from the dead, they will not be able to build a biotech company of this level

---

[7] Under California law, a tortious interference with contractual relations claim has five elements: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts to induce breach *or disruption of the contractual relationship*; (4) actual breach; and (5) resulting damage." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022) (emphasis added). Kim notably omitted the second part of the third element of such a claim when stating the law in his motion.

1    or attract this world-class Big Pharma talent you see in the data.") and the June 30th email (which

2    allegedly inaccurately declared CG Invites no longer under Cho family control and stated that the

3    current entity would be dissolved and that all IP and relationships would be transferred), taken

4    together, plausibly demonstrate animosity toward Cho and constitute actions to displace Cho from

5    majority control under the Spinoff Agreements.  SAC ¶¶ 91, 94-95.  Moreover, Kim's alleged

6    deletion of data and evidence from the CGP Electronic Devices that he was obligated to preserve

7    calls into question whether Kim was acting with an improper motive.  *Id.* ¶¶ 102, 103.  Kim's

8    motion does not address the CGP Electronic Devices or his alleged failure to comply with his

9    preservation obligations.

10       The complaint has alleged "enough facts to state a claim to relief that is plausible on its

11   face" as to tortious interference.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

12       **B.    Aiding and Abetting Fraud Against Kim (Claim Ten)**

13       A claim for aiding and/or abetting fraud in California requires plaintiff to allege that

14   defendant (1) substantially assisted or encouraged another to breach a duty, or . . . substantially

15   assisted another's tort through an independently tortious act"; (2) had actual knowledge of the

16   fraudulent conduct or breach; and (3) was a substantial factor in the plaintiff's harm. *ESG Cap.*

17   *Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016).  Under Rule 9(b), claims for aiding

18   and/or abetting fraud require the plaintiff to allege the substantial assistance element with

19   heightened specificity.  *McGraw Co. v. Aegis Gen. Ins. Agency, Inc.*, No. 16-cv-00274, 2016 WL

20   3745063, at *6 (N.D. Cal. July 13, 2016) (citing *Neilson v. Union Bk. of Cal., N.A.*, 290 F. Supp.

21   2d 1101, 1129-30 & n. 81 (C.D. Cal. 2003)).  The heightened pleading standard prohibits a

22   complaint from "merely lump[ing] multiple defendants together"; they must "differentiate [the]

23   allegations . . . and inform each defendant separately of the allegations surrounding his alleged

24   participation in the fraud." *Swartz v. KPMG LLP*, 476 F. 3d 756, 764-65 (9th Cir. 2007).

25       Kim argues that Cho's claim for aiding and abetting fraud warrants dismissal because the

26   SAC fails to set forth well-pleaded factual allegations that Kim substantially assisted or

27   encouraged a breach of duty or a tortious action or was a substantial factor in Cho's harm.  Kim

28   Mot. 7.  He contends that the two emails at issue in the tortious interference claim "establish only

United States District Court
Northern District of California

self-promotion" and "[vague] discussion about possible future events" without explaining "what damage [to Cho] occurred or how Kim allegedly caused it." *Id.*

Kim analogizes the present case to *Impac Warehouse Lending Group v. Credit Suisse First Boston LLC*, 270 F. App'x. 570 (9th Cir. 2008). There, a warehouse lender, Impac, sued buyers of secondary-market mortgage loans being sold by a mortgage broker as part of a fraudulent scheme; Impac alleged aiding and abetting fraud and conversion, along with conspiracy and negligence claims. The district court dismissed the complaint, and the Ninth Circuit affirmed, finding that the aiding and abetting claims against defendants failed, because even if the defendants had *actual knowledge* of non-parties' fraud, the complaint failed to allege that the defendants *substantially assisted* the fraud. *Id.* at 572 (citing *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003)). Substantial assistance requires the defendants' contribution to be a substantial factor of the plaintiff's injury, and there, the harm to Impac solely stemmed from the non-party's activity, not from the defendants' conduct. *Impac Warehouse Lending Group*, 270 Fed. App'x. at 572; *Neilson*, 290 F. Supp. 2d at 1128.

Kim compares himself to the defendants in *Impac*, arguing that even if he planned to benefit from a scheme designed to displace Cho from power, any harm suffered by Cho resulted from the actions of others, not from Kim. Kim Mot.7. As such, Kim argues that the aiding and abetting fraud claim should be dismissed. *Id.* at 7-8. While Cho distinguishes *Impac Warehouse Lending Group* from the present case on the basis that Cho has alleged detailed facts to support his claims, he does not address Kim's argument that Kim's conduct was not a substantial factor of Cho's injury. Oppo. to Kim Mot. 10.

Cho relies on *Flatworld Interactives LLC v. Apple Inc.*, for the rule that a plaintiff alleging aiding and abetting fraud need only plead that the defendant made a "conscious decision to participate," and did participate, in defendant's scheme. Oppo. to Kim Mot. 9 (citing *Flatworld Interactives LLC v. Apple Inc.*, No. 12-cv-01956-WHO, 2013 WL 6406437, at *3 (N.D. Cal. Dec. 6, 2013)). That case involved very different facts. In *Flatworld*, defendant Apple Inc. moved to disqualify the plaintiff's firm because one of its attorneys knew of, and substantially assisted, one of *Apple*'s out-of-house attorney's misconduct. *Flatworld*, No. 12-cv-01956, 2013 WL 4039799,

United States District Court
Northern District of California

at * 1. I held that the allegations that Flatworld "knew that [Apple's attorney] owed a duty of loyalty to Apple and that Flatworld was 'actively asking for and using [Apple's attorney's] free legal advice'" met the pleading standard for Apple's aiding and abetting claim. *Flatworld*, No. 12-cv-01956, 2013 WL 6406437, at *4.

Cho argues that here, as in *Flatworld*, the SAC pleaded sufficient facts to demonstrate Kim's "conscious decision to participate." In support, he points out that Kim "agree[d]" to displace him as the new head of Ivaltinostat, *see* SAC ¶ 91, and that Kim engaged with counsel to "dissolv[e] CGP and transfer its assets," *id.* ¶¶ 99, 251-52. *See* Oppo. to Kim Mot. 9-10 (citing SAC ¶¶ 91-99, 251-252). Kim distinguishes *Flatworld* because "in *Flatworld*, substantial assistance was not shown by an individual merely emailing a lawyer about possible future events (as is the case here), but by the counter-defendant repeatedly, over many years, having the lawyer engage in tasks that the counter-defendant knew breached the lawyer's ethical duties." *Flatworld*, No, 12-cv-01956, 2013 WL 6406437, at *3 (parenthetical added); Kim Reply 4.

While the June 29, 2024, email from Kim to Inchul Chung does indicate Kim's interest in replacing Cho as "the new head of Ivaltinostat development," the email contains no mention of the other defendants, much less any collective plan, scheme, or fraudulent activity among the other defendants. *See* SAC ¶ 91. Moreover, in reference to the June 30, 2024, email from Kim to Sale Kwon, Cho repeatedly asserts that Kim "engaged California counsel," but fails to plead any facts to suggest that Sale Kwon responded to the email, agreed to work with Kim and/or CG Invites, or that there was any further correspondence or action resulting from the email. *See, e.g.*, Oppo. to Kim Mot. 1, 7, 9, 10. Only once in his opposition does Cho fairly characterize the contents of the email, describing it as a "detailed recitation of the scope and purpose of defendant's [alleged] scheme." Oppo. to Kim Mot. 10.

The SAC does not meet the heightened pleading standard when alleging the substantial assistance element of the aiding and abetting fraud claim. *See McGraw Co. v. Aegis Gen. Ins. Agency, Inc.*, No. 16-cv-00274, 2016 WL 3745063, at *6 (N.D. Cal. July 13, 2016) (citing *Neilson v. Union Bk. of Cal., N.A.*, 290 F. Supp. 2d 1101, 1129-30 & n. 81 (C.D. Cal. 2003)). While the emails show Kim's interest in potentially displacing Cho from control, Cho fails to allege an

explicit connection between the emails and harm suffered, or any further action or consequence that resulted from the emails. Moreover, Cho neglected to address Kim's argument that Kim's conduct was not a substantial factor of Cho's injury. Here, as in *Impac Warehouse*, the aiding and abetting fraud claim fails because the harm alleged by Cho resulted from the actions of others, and the SAC fails to plead with heightened specificity that Kim's alleged contribution was a substantial factor of Cho's injury. Kim's motion to dismiss this claim is GRANTED. Cho may amend it.

### C.    Civil Conspiracy Against Kim (Claims Eleven and Twelve)

I have already discussed the factual allegations underpinning Cho's civil conspiracy claims against all the defendants. *See* discussion *supra* Section II(A)(4). The same analysis applies to Kim. Cho has set forth facts that, pending resolution of the threshold issue of performance, tend to show "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages . . . ." *ESG Cap. Partners*, LP, 828 F.3d at 1039.

Kim's only argument against his inclusion in the civil conspiracy claim is that he "appears in only two paragraphs in each of Cho's claims for conspiracy." Kim Mot. 8. As Kim notes, "[t]hose paragraphs allege that Kim authored 'several communications that describe in great detail the object of Defendants' fraudulent conspiracy, and each Defendants' role in the conspiracy' and that 'Kim took overt actions to create corporate entities to house the stolen Ivaltinostat assets, and solicited assistance from third parties to effect Defendants' scheme to 'shut down' CGP and 'transfer all the IP and study logistics' of Ivaltinostat 'to the new entity' created by Leo Kim, Inchul Chung and Yong Kyu Shin.'" *Id.* (citing SAC ¶¶ 263-64, 274-75).

Cho has set forth sufficient facts to support a civil conspiracy claim against Kim as well as the other defendants, presuming he can amend his complaint to resolve the performance ambiguity.

## IV.    PERSONAL JURISDICTION

The facts alleged at this point support personal jurisdiction over Defendants. Defendants devote relatively little of their motion to the issue of personal jurisdiction, merely stating that Defendants are Korean nationals residing in Korea (or Korean companies). They do not address

United States District Court
Northern District of California

the personal jurisdiction implications arising from the defendants' actions alleged in the SAC. CGI Mot. 16, 17.  The individual defendants' Korean nationality or residence does not preclude this Court from exercising personal jurisdiction over them.  Their alleged involvement in actions purposefully directed at California through CGP, a California corporation, warrants the exercise of personal jurisdiction over Inchul Chung, Soo Yeon Oh, Yong Kyu Shin, Randall Lee, and the Newlake entities.  They "knew California law governed the Subscription and Shareholders' Agreements, knew [Cho] resided in California, and knew the Statements of Information would be filed with the California Secretary of State." Oppo. to CGI Mot. 22-23.

Cho also alleges that Randall Lee and the Newlake entities "funded Defendants' fraudulent scheme to 'shut down' CGP (a California corporation) and misappropriate the company's assets" and that they "tortiously interfered with" the Spinoff Agreements. Oppo. to CGI Mot. at 24 (parenthetical added) (citing SAC ¶¶ 260-262).  He contends that Randall Lee and the Newlake entities "committed multiple intentional acts, including funding the plan to shut down CGP, forming an entity to which to transfer CGP's assets, causing CG Invites to breach the Spinoff Agreements, causing the purported replacement of CGP board members whom only Cho had a right to appoint, and causing the filing of false papers pertaining to CGP with the California Secretary of State, all in derogation of [Cho's] rights."  Oppo. to CGI Mot. 24.  Defendants' reply largely ignores Cho's argument regarding personal jurisdiction over Randall Lee and the Newlake entities, devoting only a couple sentences to Randall Lee and the Newlake entities' alleged lack of contact with California. CGI Reply 23-24.

## V.     FORUM

The parties are also at odds about whether this case belongs in this court at all.  The defendants argue that forum selection clauses in the Spinoff Agreements mandate that the case proceed in Korea.

As described in the Background ("The CGP Spin-Off") section, Cho proposed the idea to spin-off CGP into an independent company in which Cho would have majority control and CGP would have the exclusive rights to develop, market, and distribute Ivaltinostat. SAC ¶ 68.  The CGP Spin-Off was memorialized in four agreements: the Subscription Agreement between CGP,

1    Cho, and CGP Invites; the License Agreement between CGP and CG Invites; the Shareholder's

2    Agreement between Cho and CG Invites; and the Shin Agreement, which was an umbrella

3    agreement gathering the three others (collectively, the "Spinoff Agreements" or the

4    "Agreements"). *Id.* ¶ 69.

5         The CG Invites defendants argue that Cho's claims are wrongly brought in this court

6    because of enforceable forum selection clauses in the Shin Agreement and License Agreement.

7    CGI Mot. 7. But Cho's claims arise out of the Subscription Agreement and the Shareholders

8    Agreement, both of which designate the "state and federal courts sitting in the state of California"

9    as the "exclusive jurisdiction" for dispute resolution. *See* Subscription Agreement § 9;

10   Shareholders agreement § 13(h). Cho states that he does not seek to enforce the Shin Agreement,

11   and he is not a party to the License Agreement. Oppo. to CGI Mot. 8.

12        Even if some of Cho's claims could be interpreted as relating to more than one agreement,

13   it is in the interest of judicial economy to enforce one forum selection clause. The application of

14   several forum selection clauses "would require segregating [Plaintiff's] claims into multiple

15   forums," which "would result in a waste of judicial and party resources," and a "massive

16   duplication of efforts." *Primary Color Sys. Corp. v. Agfa Corp.*, SACV 17-00761 JVS (DFMx),

17   2017 WL 8220729, *6-*7 (N.D. Cal. July 13, 2017) (enforcing "only one forum-selection clause"

18   designating New Jersey as the dispute resolution forum where the "majority of [Plaintiff's]

19   claims…arise out of" that agreement). Defendants acknowledge that the four agreements that

20   comprise the Spinoff Agreements contain forum selection clauses specifying three different

21   venues but assert that Cho's claims are fundamentally linked to the Shin Agreement such that they

22   cannot possibly honor all three designated forums. They maintain that Seoul, Korea is the correct

23   forum for this action. CGI Reply 9.

24        Given that Cho's claims appear to arise primarily (if not entirely) out of the Subscription

25   Agreement and the Shareholders Agreement, and those two contracts contain forum selection

26   clauses identifying the state and federal courts of California as the courts of exclusive jurisdiction,

27   and considering that the defendants have also filed suit against Cho's family in state court in

28   California, for now, the case may proceed here. It would be more efficient for the courts and for

United States District Court
Northern District of California

the parties if all litigation related to the ownership structure of CGP were to proceed in one forum.

## VI.    ARTICLES OF INCORPORATION

The CG Invites defendants raise another threshold issue with Cho's claims: they say that CGP's Articles of Incorporation, which can be found on the California Secretary of State website, were never amended to allow the issuance of shares to Cho that he says made him the 60% majority shareholder and controller of CGP.  The CGP Articles of Incorporation were filed with the CA Secretary of State on October 27, 2006.  Dkt. No. 59, Ex. A.  They provide that CGP "is authorized to issue only one class of stock and total number of shares which [CGP] is authorized to issue is 1,000,000 (one million.)" *Id.*  From the time of incorporation, 2006, until at least 2024, CG Invites was the sole holder of stock.

The CG Invites defendants contend that "[Cho] does not allege anywhere in the SAC whether CGP's Articles of Incorporation was adequately amended to authorize the alleged issuance of the new shares," meaning that he presupposes an unsupported fact that they find fatal to his claims.  CGI Mot. 8.  Defendants state that Cho admitted that the Articles of Incorporation *could have never been* amended "due to the lack of consent from CG Invites as CGP's minority shareholder" because "Section 7 of the Shareholders Agreement provides that the approval of 'all shareholders that own at least a 10% ownership in the Company' is required for CGP to take certain core organizational acts'" including "amendments to CGP's articles of incorporation."" CGI Mot. 8-9 (citing SAC ¶ 222).

Cho concedes that the Articles were never amended, but characterizes their amendment as a "simple ministerial act[,]" the absence of which would not by itself nullify what he says is his rightful 60% majority shareholder status.  Oppo. to CGI Mot. 12.  While Cho's authority is not on-point (he relies on *Theophilos v. C.I.R.*, 85 F.3d 440, 447 n.20 (9th Cir. 1996) for the principle that amending articles of incorporation is a "ministerial act," but misreads the Ninth Circuit's use of that phrase—the court in *Theophilos* observed that amendment was straightforward, not that it was unnecessary or a mere formality), I agree with him that this issue does not appear fatal to his claims, at least at this stage.  It is not clear to me what effect the (lack of) amendment to CGP's articles of incorporation will have on Cho's claims, but the answer can be borne out through

discovery.

## CONCLUSION

For the foregoing reasons, the CG Invites defendants' motion to dismiss is GRANTED so that Cho may amend his complaint to show performance under the contracts that form the basis of his claims. Kim's motion is GRANTED in part and DENIED in part. Any amended complaint shall be submitted within 20 days of the date below.

**IT IS SO ORDERED.**

Dated: August 18, 2025

_____
William H. Orrick
United States District Judge