UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOONG MYUNG CHO,<br><br>  Plaintiff,<br><br>  v.<br><br>CG INVITES CO., LTD., et al.,<br><br>  Defendants. | Case No. 24-cv-07112-WHO<br><br>**ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFF'S MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 74, 75, 77, 78, 79, 80, 82, 83, 84, 85 |

In this ongoing corporate ownership dispute, defendants CG Invites Co., LTD; Inchul Chung; Soo Yeon Oh; Newlake Invites Investment, LTD; Newlake Alliance Management, LTD; Seung Hee Lee ("Randall Lee"); and Yong Kyu Shin (collectively, the "CG Defendants") move to dismiss all derivative claims brought by plaintiff Joong Myung Cho ("Cho" or "plaintiff") in his third amended complaint (the "TAC"). Defendant Minkyu "Leo" Kim also moves to dismiss all claims brought against him, including those for tortious interference with contract, aiding and abetting fraud, and civil conspiracy. Cho, in response, also moves to strike alleged "new" arguments made by the CG Defendants in their reply brief.

The CG Defendants are correct in arguing that the contemporaneous ownership rule prevents Cho from bringing his derivative claims in this case, as he lacked standing at the time of filing suit as a non-shareholder to CGP. Accordingly, their motion to dismiss the derivative claims is GRANTED. Cho's motion to strike is DENIED, as the CG Defendants' supposed "new" arguments are in fact recapitulations of those points they made in the motion to dismiss.

Kim's motion to dismiss is GRANTED IN PART and DENIED IN PART. I agree with Kim that Cho's tortious interference with contract and derivative civil conspiracy claims fail for similar reasons described in my prior orders dismissing these claims. However, Cho's aiding and

abetting and non-derivative civil conspiracy claim are adequately pleaded; they do not appear to focus exclusively on the issue of majority ownership at the time of filing suit.

**BACKGROUND**

The parties are now familiar with the background of this case, as I have detailed in previous orders. *See* Order on Motions to Dismiss ("SAC Order") [Dkt. No. 72]. I rely only the information necessary to resolve this motion.

On August 18, 2025, I granted in part defendants' motion to dismiss, providing Cho with the opportunity to amend his complaint to allege more clearly "how he has attained 60% majority shareholder status in CGP, a condition that undergirds the vast majority of his claims." *Id.* at 1–2. Subsequently, on September 8, 2025, Cho filed the TAC. *See* TAC [Dkt. No. 73].

On September 25, 2025, the CG Defendants moved to dismiss all derivative claims (counts filed against them. *See* Notice of Motion and Motion to Dismiss Derivative Claims [Dkt. No 74]. Shortly thereafter, Kim filed his own motion to dismiss on September 29, 2025. *See* Motion to Dismiss all Claims Against Defendant Minkyu Leo Kim [Dkt. No. 75]. Cho filed his oppositions on October 9, 2025, and October 14, 2025, respective. *See* Opposition to CGI Defendants' Motion to Dismiss ("CG Oppo.") [Dkt. No. 77]; Opposition to Minkyu Leo Kim's Motion to Dismiss ("Kim Oppo.") [Dkt. No. 79]. The CG Defendants filed their reply on October 16, 2025. *See* Reply in Support of Motion to Dismiss Derivative Claims ("CG Repl.") [Dkt. No. 82]; Reply in Support of Motion to Dismiss ("Kim Repl.") [Dkt. No. 83].

In addition to the motions to dismiss, on October 20, 2025, Cho filed a motion to strike Sections I, II, and III from the CG Defendants' reply, arguing that it impermissibly raised new arguments without providing him with an opportunity to respond. *See* Motion to Strike the CG Invites Defendants' New Arguments Raised on Reply ("Strike Mot.") [Dkt. No. 84]. In the alternative, Cho requests that I grant him the opportunity to file a sur-reply to address these issues. *Id.* CG Defendants filed an opposition to the motion to strike on November 3, 2025, arguing that the reply did not raise any new arguments and that they were all responsive to defenses raised by Cho in his opposition. *See* Opposition to Plaintiff's Motion to Strike Alleged "New Arguments" in Reply ("Strike Oppo.") [Dkt. No. 85].

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**I.  CG Defendants' Motion to Dismiss**

**A. Applicable Law**

The parties first dispute the proper standard for a motion to dismiss in derivative shareholder lawsuits. The CG Defendants contend that derivative standing in shareholder lawsuits

3

"requires strict compliance with [both] FRCP 23.1 and California Corporations Code § 800(b)(1)," which requires parties to be shareholders at the time of filing a derivative suit. CG Mot. at 4. Cho asserts that "in Federal diversity actions a plaintiff's derivative standing is determined by Federal Rule 23.1, not California Corporation Code § 800(b)(1)," as the issue of derivative standing is procedural, rather than substantive, in nature. CG Oppo. at 2; *Kona Enter., Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999).

Under Federal Rule of Civil Procedure 23.1, all complaints raising derivative claims must "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on its by operation of law." Fed. R. Civ. P. 23.1(b)(1). Section 800(b) of the California Corporations Code similarly prohibits any action unless:

> (1) The plaintiff alleges in the complaint that plaintiff was a shareholder, of record or beneficially, or the holder of voting trust certificates at the time of the transaction or any part thereof of which plaintiff complains or that plaintiff's shares or voting trust certificates thereafter devolved upon plaintiff by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of; provided, that any shareholder who does not meet these requirements may nevertheless be allowed in the discretion of the court to maintain the action on a preliminary showing to and determination by the court, by motion and after a hearing, at which the court shall consider such evidence, by affidavit or testimony, as it deems material, that (i) there is a strong prima facie case in favor of the claim asserted on behalf of the corporation, (ii) no similar action has been or is likely to be instituted, (iii) the plaintiff acquired the shares before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains, (iv) unless the action can be maintained the defendant may retain a gain derived from defendant's willful breach of a fiduciary duty, and (v) the requested relief will not result in unjust enrichment of the corporation or any shareholder of the corporation; and
>
> (2) The plaintiff alleges in the complaint with particularity plaintiff's efforts to secure from the board such action as plaintiff desires, or the reasons for not making such effort, and alleges further that plaintiff has either informed the corporation or the board in writing of the ultimate facts of each cause of action against each defendant or delivered to the corporation or the board a true copy of the complaint which plaintiff proposes to file.

Cal. Corps. Code § 800(b)(1) (emphasis added).

To support his position, Cho primarily relies on *Kona Enterprises, Inc. v. Estate of Bishop*,

4

where the Ninth Circuit concluded that "Rule 23.1's continuous share ownership requirement is procedural in nature and thus applicable in diversity actions." 179 F.3d at 769. CG Defendants argue that *Kona* contemplates that "state derivative standing law reaches the same conclusion," and that "under both Rule 23.1 *and* California law," derivative standing is required to be shown. *See* CG Repl. at 10 (emphasis added). CG Defendants are incorrect. While *Kona* does discuss state derivative law, it does so only when contemplating "if Rule 23.1 were inapplicable in diversity actions," which it affirmatively concluded applied. *See* 179 F.3d at 769–70. As a result, the standing requirements for derivative claims must be in adherence with Rule 23.1, meaning any argument based on § 800(b)(1) is inapplicable.

### B. Derivative Standing

Turning to the merits of the parties' arguments, the CG Defendants dispute the timing of Cho's allegations. They point out that the TAC "seeks to impose liability for acts that allegedly occurred in 2023 and 2024," even though "his six billion KRW capital contribution was not completed under February 2025." Mot. at 6. Because of this, the CG Defendants argue that the "contemporaneous ownership rule"—the principle that a plaintiff "cannot sue derivatively for misconduct that occurred before he became a shareholder"—bars Cho from bringing his derivative claims. *Id.* (citing *Kruss v. Booth*, 185 Cal. App. 4th 699, 714 (2010); *Hogan v. Ingold*, 38 Cal. 2d 802, 809 (1952)).

In his opposition, Cho argues that no "quantum requirement" exists for derivative claims, and that his complaint only "needs to allege that he was 'a shareholder,' not that he owns a particular number of shares." Oppo. at 3. This was met here, he claims—his TAC includes facts showing he commenced his capital contribution obligations on July 15, 2024, which entitled him to 15% of his 3,528,412 CGP shares. *Id.*; *see* TAC ¶ 147. Because his derivative claims focus on post-July 15, 2024 conduct, Cho concludes that he was a shareholder at the time of the alleged misconduct, making the contemporaneous ownership rule inapplicable. Oppo. at 3–4.

In reply, the CG Defendants point out that Cho does not *actually* show that shares of CGP were, in fact, issued to him; rather, he simply lists the investments he made into the company between July 15, 2024 and August 25, 2025. *See* CG Repl. at 3–4. Cho takes issue with this

characterization, which forms the basis of his motion to strike.  *See* Strike Mot.  He argues that the "issuance" requirement was only raised for the first time on reply, and even so, "CG Invites continues to block CGP from recognizing Plaintiff's shares, and continues to interfere with and obstruct CGP's operations."  *Id.* at 2 (citing TAC ¶¶ 202–03, 233–35, 240–41).

CG Defendants are correct that issuance of shares is a necessary element to establish derivative standing.  Federal Rule of Civil Procedure 23.1 establishes "stringent" pleading requirements, and courts have inferred from its language not only "that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts," but also "that the plaintiff retain ownership of the stock for the duration of the lawsuit."  *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (citing *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983)).  Under California Corporations Code § 409(a), "shares may be issued" only upon the issuance of consideration.

Here, the TAC alleges that Cho has standing to bring derivative claims because he "invested 6 billion KRW (approximately $4 million) into CGP for 60% of the company's shares," and that "all conditions for the [Spinoff Agreements] to become effective and binding have been met."  TAC ¶ 38.  Cho also provides a chart clearly identifying his investments into CGP, which began as early as July 15, 2024.  *Id.* ¶ 147.  However, nowhere in the TAC does Cho adequately allege that he was issued CGP shares as a result of his investments.  In fact, Cho appears to allege the opposite—that "CG Invites and the CG Invites Defendants have used CG Invites' refusal to authorize the issuance of new CGP shares to excuse CG Invites' failure to satisfy its obligation to invest 4 billion KRW in CGP, and justify CG Invites' attempts to divest Dr. Cho of his controlling interest in CGP."  TAC ¶ 202.  This refusal was predicated by CG Invites' decision not to "amend CGP's articles of incorporation, which CG Invites asserts is a precondition to CGP's issuance of new shares."  *Id.* ¶ 203.

I previously addressed the issue of CGP's Articles of Incorporation in the SAC Order, where I wrote that it was "not clear to me what effect the (lack of) amendment to CGP's articles of incorporation [would] have on Cho's claims."  SAC Order at 27.  Here, the answer becomes clear: considering the lack of amendment, Cho could not have been issued shares and thus lacked the requisite standing to plead a derivative claim.

6

The CG Defendants' issuance argument stems from the same statutory authority—Federal Rule 23.1 and California Corporations Code §§ 409 and 880(b)(1). While the original motion admittedly does not reference the issuance problem, it can plausibly be inferred as a response to Cho's argument about the partial issuance of shares under § 409(d). *See* CG Oppo. at 3. Accordingly, I do not think that this argument should be struck. "While a court need not consider evidence submitted for the first time in a reply," *Zamani v. Carnes*, 491 F.3d 990, 997 (2007), "it may consider evidence and argument submitted with a reply that is *responsive* to arguments raised in the non-moving party's brief in opposition." *Ejonga v. Strange*, No. 2:21-cv-01004-RJB-GJL, 2023 WL 4457142, at *1 (W.D. Wash. July 11, 2023) (citing *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, No. CV 05-08891, 2013 WL 12080306, at *4 (C.D. Cal. Oct. 8, 2013), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018)).

Therefore, because Cho cannot show derivative standing at this stage, his derivative claims must be dismissed.[1]

**C. Cho's Remaining Claims**

Assuming dismissal is necessary for Cho's derivative standing claims, the TAC pleads nine causes of action—Count One (breach of shareholders' agreements against CG Invites); Count Two (breach of subscription agreement against CG Invites); Count Five (breach of the implied covenant of good faith and fair dealing against CG Invites); Count Six (fraud against CG Invites, Inchul Chung, and Yong Kyu Shin); Count Eight (tortious interference with contract against Leo Kim); Count Nine (aiding and abetting fraud against Soo Yeon Oh); Count Ten (aiding and abetting fraud against Leo Kim); Count Eleven (civil conspiracy against all defendants); and Count Thirteen (declaratory judgment). *See* TAC ¶¶ 152–309.

Each of these claims are brought by Cho in his personal capacity, arise from the same facts

---

[1] I similarly do not find that equitable standing favors Cho. The Ninth Circuit has "rejected applying an equitable exception to the continuous ownership requirement." *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012–13 (9th Cir. 2010). Some courts outside the Ninth Circuit have recognized equitable standing for the continuous ownership requirement, including when a shareholder "challenges a corporate transaction that resulted in no continuing shareholders that could bring derivative claims," or "where there is no business justification for a transaction other than to terminate a lawsuit. *Id.* None of those situations apply here.

7

1  as the derivative claims, and thus avoids any derivative standing issues. *See id.* Even without his

2  derivative claims, each form of relief sought would still be permissible. *See id.* Accordingly, I

3  find it appropriate for this case to proceed without Cho's derivative claims.

## II. Minkyu "Leo" Kim's Motion to Dismiss

In addition to the CG Defendants, Kim seeks to dismiss all claims brought against him, including Count Eight (tortious interference with contract), Count Ten (aiding and abetting fraud), and Counts Eleven and Twelve (civil conspiracy). *See* Memorandum of Points and Authorities in Support of Motion to Dismiss all Claims Against Defendant Minkyu Leo Kim ("Kim Mot.") [Dkt. No. 75-1]. Kim first argues that all of Cho's claims against him are premised on a theory that he "attempted to deprive Cho of his majority ownership of CGP," despite the TAC allegedly establishing that Cho "was not the majority owner of CGP at the time" of the alleged incidents. *Id.* at 5. He also adopts the CG Defendants' argument regarding Cho's derivative standing for his civil conspiracy (Count Twelve) claim, as he was not CGP's majority owner when he filed this action. *See id.* at 13. Finally, he argues that Cho failed to correct the deficiencies in his aiding and abetting fraud (Count Ten) claim, which I previously dismissed. *Id.*

### A. Count Eight (Tortious Interference with Contract)

Under California law, a tortious interference with contractual relations claim has five elements: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts to induce breach or disruption of the contractual relationship; (4) actual breach; and (5) resulting damage." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022).

Kim maintains that the TAC alleges he "interfered with a deal between CG Invites and Cho whereby Cho would become the majority owner of CGP because Kim attempted to become the head of CGP himself" in June and July 2024. Kim Mot. at 11 (citing TAC ¶¶ 246–51). He argues that Count Eight only provides "one example of Kim disrupting the performance of any agreement"—that he "interfered with Cho's majority ownership of CGP." Kim Repl. at 11. However, because Cho was not the majority owner of CGP during June and July 2024, Kim concludes this claim must be dismissed. *Id.*

8

Conversely, Cho argues that my order regarding his second amended complaint ("SAC Order") is instructive on this issue. *See* Order on Motions to Dismiss ("SAC Order") [Dkt. No. 72] at 20. There, I found that Cho "adequately pleaded a claim against Leo Kim for tortious interference with contract" based on the evidence provided to me—namely, emails on June 29, 2024 and June 30, 2024 that showed Kim seeking legal advice to displace Cho as the head of the Ivaltinostat clinical trials. *Id.*; *see* Kim Oppo. at 4. Cho maintains that Kim has provided "no ground[s] for reconsideration" of my Order, as he "had ample opportunity to raise [other] argument[s] when he challenged the [SAC], but he chose not to." Kim Oppo. at 5.

Absent from Cho's discussion of the SAC Order is a crucial fact—that this finding was contingent upon a showing by Kim that "plausibly demonstrate animosity toward Cho and *constitute actions to displace [him] from majority control under the Spinoff Agreements*." *Id.* at 21 (emphasis added). As explained above, Cho was not a majority owner of CGP until February 2025, months after the June and July emails were sent by Kim. Because the date of majority ownership was not pleaded in the SAC, my reasoning for upholding the tortious interference claim does not stand now that we know the date of majority ownership by Cho. Since Cho has not provided any other information in the TAC suggesting that Kim was "disrupt[ing] . . . the contractual relationship," Count Eight must be dismissed.

B. **Count Ten – Aiding and Abetting**

A claim for aiding and/or abetting fraud in California requires the plaintiff to allege that the defendant (1) "substantially assisted or encouraged another to breach a duty, or . . . substantially assisted another's tort through an independently tortious act"; (2) had actual knowledge of the fraudulent conduct or breach; and (3) was a substantial factor in the plaintiff's harm. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016). Under Rule 9(b), claims for aiding and/or abetting fraud require the plaintiff to allege the substantial assistance element with heightened specificity. *McGraw Co. v. Aegis Gen. Ins. Agency, Inc.*, No. 16-cv-00274, 2016 WL 3745063, at *6 (N.D. Cal. July 13, 2016) (citing *Neilson v. Union Bk. of Cal., N.A.*, 290 F. Supp. 2d 1101, 1129–30 & n.81 (C.D. Cal. 2003)). The heightened pleading standard prohibits a complaint from "merely lump[ing] multiple defendants together"; they must

"differentiate [the] allegations . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).

In the TAC, Cho alleges that after being terminated, Kim "accessed CGP's and CG Invites' servers . . . [and] confidential business documents, downloaded the documents to his CGP electronic devices, and then provided those documents and communications to CG Invites in furtherance of Defendants' fraud." TAC ¶ 273. Kim accessed the CGP and/or CG Invites servers "799 times" between June 27, 2024, and July 4, 2024, despite being terminated on June 27, 2025. *Id.* ¶¶ 272. Kim then "destr[oyed the] evidence stored on his CGP-issued laptop and iPhone." *Id.* ¶ 274. However, CG Invites was able to use the confidential CGP documents Kim allegedly downloaded in furtherance of their fraud, including the "particular legal actions taken in the weeks immediately after Leo Kim's departure . . . such as . . . demanding Dr. Cho's immediate resignation . . . from the board of CGP." *Id.* ¶ 275.

The parties dispute whether these facts show that Kim's actions were a "substantial factor" in the fraud that caused Cho's alleged harm. *See ESG Cap. Partners, LP*, 828 F.3d at 1039. Kim argues that the TAC alleges he "aided and abetted fraud by participating in conversations about taking over CGP from Cho in June 2024 and accessing CGP's and CG Invites' computer servers in June and July 2024." Kim Mot. at 12; TAC ¶¶ 12, 147, 268–78. However, because Cho was not majority owner in June and July 2024, Kim concludes that he could not have "substantially assisted or encouraged another to breach a duty" concerning Cho's alleged majority ownership of CGP. *See id.*; *ESG Cap. Partners, LP*, 828 F.3d at 1039.

Even so, Kim argues that Cho failed to meet the heightened pleading requirements of Rule 9(b). He points out that while Cho "specifically alleges that the other Defendants recruited Kim to join their scheme in June 2024," *see* TAC ¶ 228, the TAC "contains no allegation that Kim knew that the Defendants never intended to perform under the agreements when they alleged induced Cho to enter into the agreements." Kim Repl. at 12. Even if Cho *did* allege that Kim obtained CGP's confidential information, Kim asserts that "it is entirely unclear how that could possibly relate to fraudulently inducing Cho to enter into agreements with the other Defendants months

10

1  prior." *Id.* Rather, all the TAC does is "raise of vague specter of misconduct simply by listing
2  unconnected (and often fabricated) events together, and then baldly asserting that these events
3  establish some nefarious scheme." Kim Mot. at 14.

4  In response, Cho claims Kim "fails to capture the full breadth of the alleged fraud." Kim
5  Oppo. at 6. He points to the fact that the TAC alleges that "the fraud Kim abetted included the
6  fraud by CG Invites, Inchul Chung, and Yong Kyu Shin as set forth in his Sixth Claim." *Id.*
7  (citing TAC ¶ 268). Those defendants "represented they would spin CGP off into an independent
8  entity under Plaintiff's control with the exclusive right to develop, market, and distribute
9  Ivaltinostat," but they ultimately "never intended to perform." *See id.*; TAC ¶¶ 211–15, 216–18.
10 Kim ultimately "aided and abetted this fraud at the end of June 2024 by seeking an attorney's
11 assistance with shutting down CGP and displacing Plaintiff as the head of the Ivaltinostat clinical
12 trials." *Id.*; TAC ¶¶ 269–72. Cho also alleges that the TAC shows that Kim "accessed the servers
13 of CGP and CG Invites between June 27 and July 4, 2024, downloading confidential business
14 documents in furtherance of the fraud." *Id.* at 7; TAC ¶¶ 269–72. Cho therefore argues that Count
15 Ten does not hinge on the timing of his majority ownership of CGP. *See id.*

16 Cho also claims that the TAC's "particularized allegations of Kim's destruction of
17 evidence[,] together with Kim's documented spike in accessing CGP's servers, and his
18 simultaneous actions in furtherance of the CG Invites Defendants' scheme to dissolve CGP[,] are
19 sufficient to plead 'substantial assistance.'" Kim Oppo. at 7; TAC ¶¶ 95–111, 269–76. He points
20 to evidence suggesting that "Kim wiped his CGP electronic devices because they contained
21 evidence Kim sought to conceal from [Cho]." *See* Kim Oppo. at 8. This destruction of evidence,
22 "done in furtherance of the CG Invites Defendants' concealment of their scheme to dissolve
23 CGP," ultimately were a "substantial factor" in Cho's harm because they "delayed . . . discovery
24 of the CG Invites Defendants' scheme until after Plaintiff had already invested $600,000 into
25 CGP." *Id.*

26 Cho relies on *Rubenstein v. Neiman Marcus Group* and *Ramirez v. Bank of America* for the
27 proposition that Rule 9(b) "may be relaxed" when information is "within the opposing party's
28 knowledge," or that "plaintiffs cannot be expected to have personal knowledge of the relevant

11

facts." 687 F. App'x 564, 567–68 (9th Cir. 2017); 634 F. Supp. 3d 733, 740 (N.D. Cal. 2022). Even though Cho admits the allegations that "Kim destroyed the primary evidence of his post-termination activities, and the precise details of which files Kim distributed to the CG Invites Defendants, when he did so, and by what method" are based upon "information and belief," he argues that these inferences are sufficient even under the Rule 9(b) standard. Kim Oppo. at 8–9. This is especially true considering my SAC Order, Cho concludes, where I found that the alleged spoliation of evidence "calls into question whether Kim was acting with an improper purpose." *Id.* at 9; *see* SAC Order at 21.

This cause of action is plausible. The TAC alleges that Kim accessed the CG Invites and CGP servers hundreds of times after his termination, and destroyed confidential documents. While Cho does not explain what information Kim obtained or deleted during these server accesses, he acknowledges that "investigations into the precise files Leo Kim accessed, altered, downloaded, or destroyed . . . have been frustrated by Leo Kim's destruction of evidence stored on his CGP-issued laptop and iPhone." TAC ¶ 274. He also alleges that they were frustrated by "CG Invites' refusal to fully turnover Leo Kim's email communications." *Id.* As a result of Kim's alleged conduct, "CG Invites [began to use] the confidential CGP documents . . . in furtherance of their fraud," including "the particular legal actions taken in the weeks immediately after Leo Kim's departure, such as Inchul Chung and Soo Yeon Oh's July 18, 2024 Letter demanding" Cho's resignation. *Id.* ¶ 275. The TAC then goes on to describe how Kim "substantially assisted Defendants' scheme to execute their fraud" by "illicitly accessing CGP's servers after [being] notified of his for cause termination." *Id.* ¶ 276. While some of Cho's allegations are on information and belief, Cho cannot be more specific in light of Kim's alleged misconduct. The Rule 9(b) pleading standard must be "relaxed" here. *Rubenstein*, 687 F. App'x at 567–68; *Ramirez*, 634 F. Supp. 3d at 740. Cho's aiding and abetting claim against Kim may proceed as is. Kim's motion to dismiss Count Ten is DENIED.

### C. Counts Eleven and Twelve – Civil Conspiracy

To plead civil conspiracy, a plaintiff must allege "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy and (3) damages arising from

the wrongful conduct." *ESG Cap. Partners v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016) (affirming adequacy of civil conspiracy allegations). When the civil conspiracy is to commit fraud, the plaintiff must plead the first two elements with particularity. *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 990–91 (9th Cir. 2006); *Armstrong v. Reynolds*, 22 F.4th 1058, 1085 (9th Cir. 2022).

Kim alleges that Cho's civil conspiracy claims are predicated on the fact that Kim intended to "displace Cho as the majority owner of CGP," despite not being the majority owner at the time of his alleged misconduct. Kim Mot. at 12. Accordingly, Cho alleges a conspiracy that, "by [his] own concessions, could not have existed prior to February 12, 2025," when he obtained majority ownership of CGP. *Id.* In addition, "to the extent that Cho alleges this conspiracy continued after February 12, 2025, Cho has not alleged any actions by Kim even remotely in that timeframe that could suffice to establish 'wrongful conduct in furtherance of the conspiracy.'" *Id.* at 12–13; *see ESG Cap. Partners, LP*, 828 F.3d at 1039.

I am unconvinced by Kim's arguments. I agree with Kim that the SAC Order established that Cho's civil conspiracy claim "proceeds partly under the assumption that CG Invites would be wrong to 'take over' CGP and its clinical trials," and that if "CG Invites remained the rightful sole owner of CGP even after the execution of the Spinoff Agreements because Cho did not invest the required funds in CGP such that the Shareholder Agreement could close, this is a moot claim." SAC Order at 17. But I disagree with his ultimate interpretation of Cho's TAC.

The TAC indicates that Cho began investing into CGP on July 15, 2024, and satisfied his payment obligations under the Spinoff Agreements on February 12, 2025. TAC ¶ 147. These payments sufficiently show that he performed under the Agreements and had a claim to the rights and benefits of those agreements. *See id.* ¶¶ 147–51; Kim Oppo. at 12. Cho's civil conspiracy claim asserts that the goal of this conspiracy was to "appoint Leo Kim the new head of Ivaltinostat department instead of the Cho family." TAC ¶ 281 (cleaned up). Despite Kim's arguments to the contrary, *see* Kim Repl. at 12–13, this does not *require* Cho to have majority ownership of CGP at the time of Kim's alleged misconduct—rather, knowledge of Cho's eventual ownership stake would suffice to indicate that Kim was engaging in "wrongful conduct in furtherance of a

13

conspiracy" to deprive Cho of the benefits of the Spinoff Agreements. *See ESG Cap. Partners, LP*, 828 F.3d at 1039.

Here, the TAC establishes enough information to suggest Kim's knowledge of the Spinoff Agreements, and his purported interest in ensuring it was not met. The TAC shows that Kim "improper[ly] access[ed] . . . and use[d] confidential information stored on CGP's servers in the days leading up to and following his termination." TAC ¶ 95. Cho then provides an email sent by Kim on June 29, 2024, which purports to show that he was interested in being "appointed the new head of ivaltinostat develop instead of the Cho family," mere months after the Spinoff Agreements were entered into by Cho and the CG Defendants. *Id.* ¶¶ 98–99. He also included Kim's June 30, 2024, email, which discussed his "scheme to steal CGP and misappropriate the company's assets to [his] entity." *Id.* ¶¶ 100–02. Finally, the TAC indicates that Kim "deleted all data and evidence from the CGP Electronic Devices" both before and after his termination, despite being "aware of his preservation obligations." *Id.* ¶ 108. This was apparently done in concert with Inchul Chung, as he requested on June 30, 2024, to "keep his CG Invites account active" for an undisclosed time. *Id.* ¶ 110.

As indicated in my SAC Order, these facts are sufficient to support a civil conspiracy claim against Kim as well as the other defendants, especially since he has resolved the ambiguities in his performance. While I do not opine on the strength of Cho's claims with respect to a conspiracy, those are factual questions a jury can resolve. At this stage, Cho has met his burden to survive a motion to dismiss.

### D.     Count Twelve – Civil Conspiracy

Kim also incorporates the CG Defendants' derivative claim for civil conspiracy on the basis that Cho lacked standing, as he was not the majority owner of CGP at the time of filing suit. *See* Kim Mot. at 13. For the same reasons described above, *supra* Section 1.B, Cho lacks derivative standing because he has not shown that he was issued shares in CGP at the time of filing this lawsuit.

## CONCLUSION

Cho's derivative claims—Count Three (breach of subscription agreement against CG

Invites), Count Four (breach of shareholders' agreement against CG Invites), Count Seven (breach of fiduciary duty against CG Invites), and Count Twelve (derivative claim for civil conspiracy against all defendants)—are DISMISSED.  Kim's motion to dismiss the TAC's claims against him is GRANTED with respect to Counts Eight (tortious interference of contract) and Twelve (derivative claim for civil conspiracy), but is DENIED with respect to Counts Ten (aiding and abetting) and Eleven (non-derivative claim for civil conspiracy).

No further amendment of the TAC is authorized absent a showing of good cause.  The defendants shall answer the TAC no later than December 19, 2025.

**IT IS SO ORDERED.**

Dated: December 4, 2025

William H. Orrick
United States District Judge